FILED
7/19/16 2:53 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| ARTHUR L. PEARSALL, JR. and | : | Case No. 14-10616-TPA |
| TAMMY L. PEARSALL, | : | |
| *Debtors* | : | Chapter 7 |
| | : | |
| MARY PEARSALL, | : | Adv. No. 14-1068-TPA |
| *Plaintiff* | : | |
| | : | |
| v. | : | Related to Doc. No.    1 |
| | : | |
| ARTHUR L. PEARSALL, JR. and | : | |
| TAMMY L. PEARSALL, | : | |
| *Defendants* | : | |

*Appearances:*      Mark A. Lindsay, Esq. for Plaintiff
Earle D. Lees, Jr., Esq. for Defendant Arthur L. Pearsall
David J. Hopkins, Esq. for Defendant Tammy L. Pearsall

### **MEMORANDUM OPINION**

The Debtors/Defendants here are Arthur L. Pearsall, Jr. (who was been referred to as "Lee" by everyone,  a practice the Court will likewise follow) and Tammy Pearsall ("Tammy").  Tammy and Lee have been married since 1994.  In this adversary proceeding, Plaintiff Mary Pearsall ("Mary") seeks a determination  pursuant to *11 U.S.C. §§523(a)(2)*, *523(a)(4)*, and/or *523(a)(6)* that the remaining principal loan obligation from an original loan of $58,000 from Mary

1

to Tammy, is not dischargeable in this bankruptcy.[1]   Mary also asserts claims for supplemental

relief in the form of the denial of an exemption and a subordination of the Debtors' equity interest

in certain real estate to her claim for repayment of the loan.   The Parties submitted their  post-trial

briefs and waived final argument.   For the reasons set forth below, the Court will find that the

remaining debt owed by Tammy to Mary on the $58,000 loan is excepted from  discharge pursuant

to *Section 523(a)(2)(A)*, but will deny the requested relief in all other respects.[2]   The Court is unable

to determine the actual amount of the remaining debt based on the current state of the record and

will therefore schedule a further evidentiary hearing for that purpose if the Parties are otherwise

unable to agree upon an amount.


### FINDINGS OF FACTS


Before setting forth its findings of fact the Court will comment on how they were

determined.   The trial in this case was centered much more on witness testimony rather than

documents, which played a secondary role at best.   Four witnesses testified at trial: Mary, Tammy,

Lee, and Mary's son, Cole Wilson.   Of these, Mary and Tammy were by far the most significant

---

[1]   As will be discussed further below, there were actually two separate loan transactions: a loan of $58,000 made on November 14, 2011 and a loan of $1,600 made in or about December, 2012.  The main focus of this Opinion will be the $58,000 loan. The minimal evidence presented by the Plaintiff as to the $1,600 loan was insufficient to meet her burden as to non-dischargeability, though the smaller loan does have some relevance in demonstrating a pattern of conduct by Tammy. Unless specified otherwise, references in this Opinion to "the loan" or "the loan obligation" should be understood as referring to the $58,000 loan only.

[2]   The Court has jurisdiction over this matter pursuant to *28 U.S.C. §§157* and *1334*. This is a core matter pursuant to *28 U.S.C. §157(b)(2)(I)*.  This *Memorandum Opinion* represents the Court's findings of fact and conclusions of law under *Fed.R.Bankr.P. 7052*.

witnesses in the Court's view in that they were the only actual witnesses to the loan transaction that is central to the case, as well as in many instances the only actual witnesses to the conversations and interactions leading up to the loan. When the testimony of these two witnesses diverged on relevant points, it fell to the Court as the trier of fact to determine which of them was more credible.

The Court followed several well-recognized strategies to assist it in making credibility determinations in this case. One was to observe, beyond their mere words, the deportment, demeanor and attitude of the witnesses. A second was to consider the consistency of their testimony under oath at different times, for example in prior depositions or verified pleadings. Third, was to examine the inherent probability, or lack of probability, of the particular facts propounded by the witness, considered in the light of all of the facts and circumstances in the record, applying ordinary common knowledge of human nature and common sense as the measure of probability. *See, generally, In re Kovler,* 249 B.R. 238, 256–57 (Bankr. S.D.N.Y. 2000), *supplemented*, 253 B.R. 592 (Bankr. S.D.N.Y. 2000), *and corrected*, 329 B.R. 17 (Bankr. S.D.N.Y. 2005).

The Court's overall impression was that Mary was a very credible witness who answered as truthfully as she could. There was no indication that she was being deliberately deceptive or evasive as to any material points in her testimony. She did not appear to be giving a rehearsed presentation, nor did she seem to be deliberately shading her testimony to fit a theme. That is not to say that the Court necessarily accepts all aspects of her testimony as true. While her mental alertness was impressive given her age and physical limitations, it was also apparent that her recollection as to some of the finer details of the relevant events, for instance times and places, may

be less than ideal.  Tammy's testimony, by contrast, appeared to be of a more calculated nature.  It

is difficult to point to any blatantly and deliberately false answer in her testimony, but the Court got

the real sense that she was tailoring her testimony toward a desired goal and, to that end, would

emphasize or downplay certain aspects as necessary.  As opposed to the openness displayed by

Mary, Tammy was more guarded and wary in her testimony.   Finally, the Court found Lee to be a

generally credible witness.

The findings of fact which follow were arrived at based on the testimony presented,

and in light of the credibility determinations as broadly described above.  The Court will not explain

in detail its thought process in arriving at a factual conclusion as to every disputed point, though if

a particular item is of key importance it will do so.

The Debtors currently own and reside at property located at 244 Toby Road, Kersey,

Pa. ("Kersey Property"), which they purchased on December 16, 2011.   Previous to that they had

owned and resided at property located at 779 Washington St., St. Marys, Pa. ("St. Marys Property").

The $58,000 loan whose dischargeability is primarily at issue in this case was related to the Debtors'

acquisition of the Kersey Property, the circumstances of which  will be discussed in further detail

below.

The Debtors are related to Mary, though not blood relatives, in that Mary was married

to Lee's grandfather (who interestingly was also named "Arthur H. Pearsall, Jr." and will be referred

to as "Arthur" to avoid any possible confusion with Lee) from 1985 until his death on July 9, 2009.

The marriage between Mary and Arthur was a second marriage for both.  Each of them had children

from the prior marriages, but no children were born during their marriage.

4

Mary is at present in her mid-80s, has remained a widow since Arthur's death, and resides by herself in a house on Green Road in  Kersey, Pennsylvania.  She has serious vision impairment, caused by macular degeneration and cataracts, as the result of which she can only  see things clearly if they are within a foot or two of her. Because of that condition she has not driven on public roads since at least 2009.  She is nevertheless  mentally alert and reports that despite her very poor vision she remains independent and able to perform considerable tasks around the house, for instance, splitting wood, gardening and canning.  She does, however, require the assistance of others to take her to  places outside of her home, and to help with such things as paying bills and managing her bank account.

During their marriage, Mary and Arthur only had  infrequent contact with the Debtors until around 2008 when Arthur was hospitalized and the Debtors visited him there.  Following Arthur's discharge from the hospital, the Debtors began to visit with him and Mary at their Green Road home on a more regular basis, and at some point, began visiting almost on a weekly basis.

As indicated above, Arthur died on July 9, 2009.  Tammy and Lee continued making regular  visits with Mary at her house after Arthur's death, often dropping by to eat dinner with her.  The Debtors would sometimes take her for car rides, for example, to look at houses that the Debtors might be interested in buying.  Sometimes Tammy would visit Mary  by herself  and help her out with things around the house. Tammy would also routinely drive Mary to places she needed to go, such as to shop or to doctor appointments.  Tammy, who at the relevant time was operating a tax preparation business out of her home,  also began assisting Mary with financial matters, for example, writing checks to pay Mary's monthly bills and preparing her tax returns.  Mary's level of comfort

with Tammy's help in handling her monetary affairs even rose to the level of giving her the "user name" and password for her checking account which allowed Tammy to access the bank account on her home computer because Mary did not have a computer at her house. Mary clearly trusted Tammy in that respect and there was no evidence presented at trial that would indicate that during this time Tammy ever misappropriated funds from the checking account. Throughout her trial testimony, Tammy referred to Mary as "Gram" and it was apparent that the two had over-time developed a close relationship.

When the visits with Mary following the death of Arthur occurred, the Debtors were residing at the St. Marys Property. However, apparently they were not entirely happy with living there. Tammy enjoyed gardening and was hoping to move to a house with more land available for that purpose. The Debtors had tried a number of times, but without success, to sell the St. Marys Property – first in 2002 and again in 2006 – prior to the hospital visits with Arthur that then gave rise to their regular visits with him and Mary. While residing at the St. Marys Property in 2006 or 2007 the Debtors became embroiled in a legal dispute with their adjacent neighbor, Virginia Allan (hereinafter referred to as "the Allan Dispute").

The Allan Dispute involved a shared driveway that straddled the property line and had existed for many years, going back to when the two adjoining properties had been owned by related family members. When Ms. Allan attempted to secure a reverse mortgage on her house, she was told she would either have to get a formally recognized and assignable easement to use the shared driveway, or else construct a new driveway elsewhere but completely on her property. The Debtors did not want to give an easement because they thought it would negatively impact the value

of their property.  Conversely, Ms. Allan did not want to construct a new driveway.  As a result, the

parties came to an impasse and a lawsuit over the matter was filed against the Debtors by Ms. Allan

in the Elk County Court of Common Pleas sometime in 2008 or 2009.[3]

As Mary quite credibly testified to at trial, during her visits, Tammy would frequently

talk about the Allan Dispute and how much stress it was causing her, Lee and their four children.

During her visits with Mary, Tammy would sometimes appear sick and complain about the effects

the dispute was having on her and her family. For example, her children were not allowed to go

through the yard with their ATVs and Lee always had to worry about whether the driveway was

plowed before they could go anywhere.  At that time, Tammy also had clients arriving at the St.

Marys Property because of her tax business and if they parked in the wrong place it could result in

Ms. Allan coming over and demanding that they move.  Tammy expressed to Mary that it was her

hope to sell the St. Marys Property and move elsewhere to relieve the stress the matter caused her.

Despite what Tammy was telling Mary, according to Lee, the Allan Dispute was not

having any significant effect on Tammy, Lee, or their children.  Lee testified that relations with Ms.

Allan remained "civil" throughout the dispute, and it did not cause identifiable strain or any

emotional grief on his family's life. Furthermore, Tammy testified that although the dispute caused

her some stress in the sense that it created uncertainty as to what would happen to the value of the

St. Marys Property should Ms. Allan prevail, she was clear in her overall testimony that any

---

[3]    At least that was the testimony from Tammy at trial.  *See* Transcript of March 10,
2016 Trial at 118:1-6, Doc. No. 73 (hereinafter "T.T.___").  The Court notes that there was a motion
filed by Ms. Allan in the main bankruptcy case that would seem to indicate that her complaint was
actually filed in March 2011.  *See* Main Case Doc. Nos. 22, 24.

underlying level of distress she might feel did not approach the level that Mary testified Tammy was describing in their conversations.

The various conversations between Tammy and Mary took place over the course of 2009 through 2011. Based partly on what Tammy was telling her, and partly on her own observations as to Tammy's demeanor, Mary became concerned for the well-being of the Debtors and their family. Mary became convinced that they needed to move away from the St. Marys Property. At some point, probably in September 2011, Mary began indicating to Tammy that she would like to help the Debtors be able to move to a new house by loaning them some money. Tammy must have at least considered the possibility of accepting such a loan at that time because she discussed it with Lee, but he told her that he had no interest in obtaining such a loan because he believed the family's budget was already stretched to the limit. Thus, Tammy initially declined Mary's offers of a loan.

As to this particular item, the Court credits the testimony of Tammy over that of Mary. Tammy testified that Mary had made several offers of a loan before the loan was actually consummated, whereas Mary testified that the only time she ever made an offer of a loan was on the date of the loan. *See*, T.T. 27:6 through 29:15. Lee testified credibly to a conversation he had with Tammy prior to the closing on the Kersey Property in which Tammy informed him that Mary was offering to make a loan and asked if he was interested. In the Court's view it is more likely that this conversation occurred prior to the actual loan, meaning Mary had made at least one prior offer.

Tammy's visits with Mary continued, and she continued complaining to Mary about the Allan Dispute and the effect it was having on her. The complaints increased in intensity and by

November Tammy was leading Mary to believe that she might hurt herself or someone else if something was not done. In a visit that took place on November 14, 2011, Tammy told Mary that she was "going nuts," and that appears to have been the final straw for Mary, who practically insisted that Tammy accompany her to the bank to see about getting a loan.

Tammy and Mary did go to Mary's bank that day and Mary inquired about how much money she could obtain on her home equity line of credit.[4]   Mary was told that she could get $58,000. When Mary asked Tammy how much she needed, Tammy responded that she needed the full amount. The transaction was then completed and Tammy was given a check for $58,000 which she took to her bank, First Commonwealth Bank, and placed the monies in a newly-opened account in the names of Tammy and Lee. Tammy had Lee's name included on the account which she was able to do without informing him and even though, at the time, he was apparently unaware of the loan. The understanding between Tammy and Mary regarding the loan was that Tammy would make the required monthly payments directly to Mary's Bank. The loan was amortized over 10 years and the initial monthly payment was around $800. At the time of the loan the Debtors had approximately $50,000 in liquid assets which could have been used toward the purchase of a house. Mary never asked about the Debtors' financial condition before offering the loan and Tammy never volunteered the information.

The evidence was unclear as to an exact date, but shortly after obtaining the loan Tammy and Lee entered into a contract to purchase the Kersey Property for $45,000, with Tammy

---

[4]   This was a pre-existing line of credit that had been opened up at an earlier time. Mary had loaned her son some money acquired through the line of credit in 2009 and that loan had been paid off by November 2011.

using $1,000 from the new First Commonwealth Bank account as a deposit.  The closing on the

Kersey Property occurred on December 16, 2011, with the Debtors taking title as tenants by the

entireties.   The Debtors were required to provide $44,977.50 at the closing to complete the

transaction ($45,000 sale price, plus $977.50 in settlement charges, less $1,000 deposit).  Tammy

got this money from the newly created First Commonwealth Bank account.  In addition to the loan

proceeds, approximately $15,000 from Lee's 401(k) account had been deposited  by Tammy into

that account shortly before the closing.  Lee did not know about the existence of the loan at the time

of the closing but thought that the cash for the purchase of the Kersey Property had come from the

401(k) funds and from "mattress money" that Tammy had been saving. In that regard, the evidence

showed that Tammy clearly was in charge of the family finances, with Lee having very little direct

involvement aside from being the primary income earner.  Tammy told Lee about the loan around

January 2012.  He was upset about it but did not speak to Mary or try to undo the loan.

The Debtors did not immediately move into the Kersey Property because it was in

poor condition and required extensive repairs.  They viewed it as a project that could be treated like

a camp until it was fixed enough that they could live there full time.   Lee did the repairs himself

with some help from family members.  The work was described as a "gut" and  included electrical

work, plumbing, flooring, walls, and clearing the property. Some of the funds from the loan were

used to buy materials and equipment for the Kersey Property, but it is clear that some of the loan

proceeds were also used for other, unrelated things.  The evidence was not sufficient for the Court

to determine by exact breakdown the amount of the loan proceeds that were used for purposes

unrelated to the Kersey Property, though it was a minority share.  The Debtors continued to live in

the St. Marys Property while work on the Kersey Property was ongoing.  They would stay in the

Kersey Property occasionally during the renovation process, beginning around October 2012, but they did not completely move in until early 2013.

Tammy initially began making the monthly payments to Mary's bank as the parties had agreed. That practice continued until August 2013. The visits between Mary and the Debtors also continued after the loan was made. A couple of incidents that occurred during the time period that Tammy was making the loan payments are noteworthy. Tammy borrowed an additional $1,600 from Mary, probably in December 2012, though the record is not entirely clear as to the time. This loan took place in DuBois on a day when Tammy had driven Mary there for some reason. Mary noticed that something seemed wrong with Tammy and asked her if she needed money, to which Tammy indicated yes. Mary suggested they go to her bank when they returned home but Tammy requested that they go to a bank branch in DuBois instead, to which Mary assented. At the bank Mary asked how much she could get on a loan and was told $1,600. She asked Tammy how much she needed and Tammy indicated the "full amount" so Mary withdrew the $1,600. Mary went to hand the proceeds to Tammy inside the bank, but Tammy refused them and said to wait until they got in the car.

The second incident concerns a written agreement that Mary prepared in a notebook at some point after the loan (again, the record is not clear as to an exact time) that seems to have been in the nature of a promissory note memorializing the $58,000 loan. Mary asked Tammy if she would sign the agreement. Tammy said she would like to take the notebook home, apparently so she could review it, and Mary agreed to that. Mary asked Tammy about the status of the agreement several times over the next several months and Tammy finally returned the notebook one day,

11

informing Mary that she had signed the agreement.  Mary did not look at the notebook that day but at a later time when her daughter Ginger was visiting it was discovered that the agreement had, in fact,  not been signed.

Another of Mary's children, Cole, discovered the existence of the loan to Tammy around June or July 2013 when he happened to see papers from the bank on Mary's kitchen table. He asked her about them and then later called and questioned Tammy and Lee about the loan.  Cole and Ginger subsequently  took Mary to see an attorney and a lawsuit over the loan was filed in state court sometime in July 2013.  It was about that time that Tammy stopped making the monthly payments on the loan.  Tammy testified that she was no longer able to make the payments because her business income had been reduced due to health issues and Lee's employment income had been reduced because his hours were cut.  The Debtors filed their bankruptcy petition on May 23, 2014.

### *DISCUSSION*

The evidence at trial clearly established that the loan obligation was between Mary and Tammy, and that if there was any fraudulent or wrongful conduct involved in connection therewith such that the debt should be excepted from discharge, it was due to the conduct of Tammy. Any liability of Lee would only be vicarious or derivative, and likewise would be an exception to his discharge.  For this reason, the Court finds it convenient to first focus on the case as against Tammy before turning to Lee.

### *Tammy's Discharge*

Mary seeks to have the loan obligation found to be excepted from discharge under the following provision of the *Bankruptcy Code:*

> (a) A discharge under section 727... of this title does not discharge an individual debtor from any debt—
>
>> ...
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>>
>> ...

*11 U.S.C. §§523(a)(2)(A).* Creditors bear the burden of proving nondischargeability under this provision by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

*Section 523(a)* is strictly construed against creditors and liberally construed in favor of debtors in furtherance of the "fresh start" policy under the Bankruptcy Code. *In re Cohn*, 54 F.3d 1108, 1113 (3d Cir. 1995).

Proof of five elements is necessary to succeed on an exception to discharge claim under *Section 523(a)(2)(A)*:

> (1) The debtor made a false representation or engaged in false pretense;
>
> (2) The debtor knew it was false at the time of the representation or pretense;

(3) The false representation or pretense was made with the intent and purpose of deceiving the creditor;

(4) The creditor justifiably relied on the representation or pretense; and

(5) The creditor was damaged as a proximate result of the false representation or pretense.

*See, e.g., Corso v. Walker*, 449 B.R. 838, 845 (W.D. Pa. 2011); *In re Sosso*, 516 B.R. 303, 312 (Bankr. W.D. Pa. 2014).

With respect to the first element, the distinction between a false representation and a false pretense is that the former is an express statement while the latter is an implied misrepresentation or a product of conduct by the debtor that fostered a false impression. *See*, *Sosso,*516 B.R. at 312; *In re Witmer*, 541 B.R. 769, 778 (Bankr. M.D. Pa. 2015) (claim of false pretense is a variation on a claim of false representation and requires proof of an implied misrepresentation promoted knowingly and willingly that creates a misleading understanding of the transaction by the creditor); *In re Feldman*, 506 B.R. 222, 228 (Bankr. E.D. Pa. 2014) (false pretense is "a set of circumstances which lead the plaintiff to a mistaken belief"); *In re Oakley*, 503 B.R. 407, 432 (Bankr. E.D. Pa. 2013) (a false pretense is an omission or implied misrepresentation that created a contrived and misleading understanding of the transaction on the part of the plaintiff); *In re Adalian*, 481 B.R. 290, 296 (Bankr. M.D. Pa. 2012) (false pretense is any series of events that create a contrived and misleading understanding of a transaction in which a creditor is wrongly induced to extend money to the debtor).

14

Mary does not point to any explicit false representations of specific, objective facts made by Tammy in connection with the loan obligation, nor does the Court find any. Instead, Mary argues that Tammy's overall conduct was such as to create a false impression that caused her to make the loan.

In her post-trial brief, Mary identifies four distinct categories of false pretenses that she contends Tammy's conduct comprised as part of a fraudulent scheme to obtain the loan:

- Feigning severe mental distress and an inclination to harm herself or someone else as a result of the Allan dispute.

- Implying that the Debtors lacked the financial wherewithal to buy another house and move from the St. Marys Property when they actually had over $50,000 in liquid assets available.

- Implying that the loan would be repaid from proceeds of the sale of the St. Mary's property.

- Misleading Mary as to how the loan proceeds would be used.

Plaintiff's Post-trial brief at 9-13.

Of these, the second category can be quickly ruled out as a possible basis for finding the loan obligation to be excepted from discharge under *Section 523(a)(2)(A)*. Even if the Court assumes that Tammy gave such an implication as to the Debtor's financial condition, *Section 523(a)(2)(A)* specifically excludes statements respecting a debtor's financial condition from the universe of false pretenses or false representations that can serve to make a debt non-dischargeable.[5]

---

[5]    False statements as to a debtor's financial condition that are in writing are separately addressed in *11 U.S.C. §523(a)(2)(B)*, but there has been no allegation or evidence of any such writing in the present case.

There is some variation in how broadly bankruptcy courts interpret what it means for a statement to rise to the level of "respecting the debtor's ... financial condition," but the second category as proposed in this case by Mary clearly falls within the statutory exclusion under even the most restrictive interpretation. *See, e.g., In re Husman*, 2013 WL 5134539 *3–4 (Bankr. W.D. Pa. 2013) (under strict interpretation a statement respecting the debtor's financial condition is any communication that presents an overall picture of the debtor's financial position).

The third category identified by Mary can also be eliminated because, simply put, there was insufficient evidence presented that Tammy "said" or "did anything" in the nature of a false pretense to lead Mary to believe the loan obligation would be repaid from proceeds of the sale of the Saint Marys Property. The testimony by Mary under direct examination by her attorney as to this was as follows:

> Q.   Mary, when you made the $58,000 loan, was there an agreement as to how it was going to be repaid?
>
> A.   No, but they kept talking about selling their house, and I figured that's probably when they're going to pay it back.
> ...
> Q.   Mary, did they -- did either Lee or Tammy ever promise to pay you when they sold the St. Marys house?
>
> A.   No, they didn't, but I was under the understanding that that's – because they kept talking about selling it, and I was under the understanding that that's what they were doing, to pay it off, or, you know, probably pay it off when they sold it.

T.T. at 33:15-18; 37: 5-11. Elsewhere Mary testified that her home equity line of credit from the bank was set up for a ten year payoff, though she was "hoping" it would be paid off sooner, which

"might" happen if the St. Marys Property was sold.  TT at 78: 22- 79: 4.

Mary may well have assumed that the loan would be repaid when the St. Marys Property was sold, but to attribute that assumption to any false pretense on the part of Tammy is a far too tenuous of a connection.  It must further be noted that, in any event,  the record indicates that the Debtors never sold  the St. Marys Property.  The Debtors still owned the St. Marys Property at the time they filed their bankruptcy case.  During the bankruptcy the mortgagee obtained relief from stay and presumably then foreclosed on it.  *See*, Order of September 19, 2014, Main Case Doc. No. 30.  Thus, the Court fails to see how the proposed third category could possibly be characterized as a false pretense or representation since even if Tammy had made such a representation, the triggering event never occurred.

The fourth category can also be ruled out as a potential false pretense.  By this category, Mary contends that Tammy misled her into believing that the proceeds of the loan would be used solely in connection with a new house to replace the St. Marys Property, whereas in actuality the proceeds were used for other things as well. The allegation here, then, is that there was a misrepresentation as to a future intent.

Before discussing this further, the Court should first note that it is satisfied that not all of the loan proceeds were used for purposes that might reasonably be considered as related to the acquisition or improvement of the Kersey Property.  The $58,000 in loan proceeds were placed into a new bank account and were then commingled with funds from another source, *i.e.*, Lee's 401(k). This commingling made it impossible to trace the use of particular funds for particular purposes with exact precision.  Despite that, it can be said that a substantial portion of the loan proceeds (at least

17

½) was used for the initial acquisition of the Kersey Property, and then a further substantial portion, though not so clearly defined, was used for purchases of materials and equipment for the repair or refurbishing of such property.  Beyond that, there was still a remainder of the loan proceeds that was used for things such as groceries, vehicle payments and general household supplies that can in no way be characterized as being related to the Kersey Property.  Both sides presented evidence purporting to show how the loan proceeds were spent, but the evidence was confusing and the broad breakdown noted above is as far as the Court is willing to go.  In any event, an exact accounting of the use of the loan proceeds is not critical to the Court's decision. By contrast, there was no testimony whatsoever as to the ultimate use of the second loan in the mount of $1,600, or even testimony relating to its purpose.

As indicated above, the fourth category relates to a future intention that Mary contends was part of the agreement by which she made the loan.  Put somewhat differently, she argues that she made the loan based on an understanding that it would be used only for a new house, and Tammy's subsequent failure to restrict the use of the loan for that purpose therefore constituted a false statement or false pretense under *Section 523(a)(2)(A)*.  The obvious danger in this line of argument is that it could transform every breach of contract into a potential basis for an exception to discharge.  For that reason, the courts that have considered this sort of argument have been very clear that,  while it is possible for a contracting party to engage in a fraudulent misrepresentation by falsely stating or implying an intention to comply with the terms of  the contract, when in fact the person does not intend to comply, a subsequent nonperformance under the contract does not of itself prove there was such a  misrepresentation.

For example, the Restatement (Second) of Torts states:

> d. *Proof of intention not to perform an agreement*.  The intention that is necessary to make the rule stated in this Section applicable is the intention of the promisor when the agreement was entered into.  The intention of the promisor not to perform an enforceable or unenforceable agreement cannot be established solely by proof of its nonperformance, nor does his failure to perform the agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into. The intention may be shown by any other evidence that sufficiently indicates its existence, as, for example, the certainty that he would not be in funds to carry out his promise.

Restatement (Second) of Torts § 530 cmt. d (1977).  Courts applying *Section 523(a)(2)(A)* follow this same approach. *See, e.g., In re Witmer*, 541 B.R. 769, 779 (Bankr. M.D. Pa. 2015) (plaintiff must establish that the debtor entered into the contract never intending to comply with the contractual terms); *In re Oakley*, 503 B.R. 407, 433 (Bankr. E.D. Pa. 2013) (a creditor's demonstration that a debtor committed a breach of contract, by itself, does not render the contract claim nondischargeable); *In re Crawford*, 476 B.R. 890, 896 (Bankr. W.D. Pa. 2012) (in order to establish actual fraud on the basis of failure to perform as promised, a plaintiff must prove that the debtor entered into an agreement with no intention of complying with the terms).

In the present case, even assuming the truth of Mary's contention that a term of the loan agreement was that the proceeds were to be used only for a new house, the fact that they were not so used, standing alone, is insufficient to establish that Tammy acted with actual fraud.  Mary was required to prove by a preponderance of the evidence that, right from the outset, Tammy never intended to comply with such restriction on the use of the proceeds.  She has, however, pointed to

no evidence, either circumstantial or direct, that would tend to show Tammy never intended to comply.[6]   In the complete absence of such evidence, the Court must find that the fourth proposed category cannot be a false pretense or false representation under the statute.

That leaves the  first proffered category as the sole remaining candidate for a false pretense to support Plaintiff's claim.  This one presents a closer call than the other three.  By this category, Mary is essentially claiming that Tammy "fooled" her into offering  to make the loan by deliberately falsifying or exaggerating the level of stress that she (Tammy) and her family were feeling because of the Allan Dispute, and by giving the false impression that she was so distraught that she  might hurt herself or her neighbor unless something was done about it.  Stated differently, this is an argument that Tammy was misrepresenting the present state of her own mind to Mary.  This is somewhat similar to the fourth proposed category discussed immediately above, although it differs in that the contention there was that Tammy was misrepresenting her intention to comply in  the  future  with  a  promise  made  in  the  present,  while  the  contention  here  is  that  she  was misrepresenting the present effect an ongoing situation was having on her mind or well-being.

Although it is perhaps a bit unusual to have the present state of a person's mind be the subject of a false pretense or false representation under *Section 523(a)(2)(A)*, and there are

---

[6]     For instance, if at the time of incurring the loan Tammy already knew how much money would be needed for the purchase of and any renovations to a new house, and if such amount was less than the $58,000 loan, then perhaps it could be inferred that she must never have intended to comply with the purported term of the loan agreement limiting the use of the proceeds.  The record indicates, however,  that the Debtors did not put an offer in on the Kersey Property until sometime after the loan was given, and did not close on it until December 16, 2011, so Tammy could not have known how much was needed for a new house at the time of the loan.

obvious issues associated with the proof thereof, the Court sees no reason why such a thing must be categorically ruled out as a possibility.  In an early English case involving this scenario, the court stated:

> The state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else. A misrepresentation as to the state of a man's mind is, therefore, a misstatement of facts.

*Edgington v. Fitzmaurice*, L.R. 29 Ch. D. 459 (1885) (quoted in W. Page Keeton, *Fraud-Statements of Intention*, 15 TEX. L. REV. 185 (1937)).

Mary credibly testified that Tammy made statements on numerous occasions over the course of several years that led Mary to believe that Tammy and her family were  under stress because of the Allan Dispute, and that they desperately wanted to sell the St. Marys Property so they could get away from it.  Mary described conversations where Tammy complained about how her children were not permitted to go through the yard, how Mrs. Allan would complain if any cars visiting the Pearsalls parked even a few inches on her side of the driveway, and how Lee always had to make sure the driveway was plowed before Tammy and Lee could visit her. Mary also credibly testified that Tammy frequently complained of feeling "sick" because of what was going on.  These various conversations are said to have culminated in an instance that happened just before the loan was given when Tammy said she was going "nuts," causing Mary to fear that someone might get hurt.

21

The Court has little trouble concluding that these conversations did occur,[7] but a more difficult issue is  whether they can properly be characterized as constituting false pretenses or false representations by Tammy.

There is no question that the Allan Dispute was real and that it resulted in a lawsuit being filed against the Debtors. Tammy testified that she was concerned that if Ms. Allan was able to secure a permanent right of way over the driveway it could have a negative impact on the value of the St. Marys Property, and that this uncertainty caused her "stress" that she talked about with various people, including Mary.  While, unless actually and truthfully told, no one knows for sure at any given time what is going on in a person's mind but the person herself, it would certainly be understandable, and perhaps even expected, that a legal dispute of this nature between neighbors could be stressful.

Cutting against this natural expectation are a couple of contrary pieces of evidence. Lee testified as follows regarding the Allan Dispute:

> Q.     Were you, in particular -- you say that you were stressed
> out by the whole situation?
>
> A.     No.

---

[7]     Indeed,  it would be inherently unbelievable for Mary to have made an offer of the loan in the absence of some sort of motivating reason, such as  being led to believe the Debtors were desperate to move from the St. Marys Property.  Tammy suggested at certain points in her testimony that Mary had come up with the idea of making a loan so the Debtors could buy a new house completely on her own, based on no prompting or input whatsoever from Tammy, and without even knowing whether the Debtors needed money to buy a house.  *See*, T.T. 126:6 through  128:4.  The Court rejects any such contention as counterintuitive and wholly improbable and further finds that the concept's very suggestion negatively impacts Tammy's credibility.

Q.    Did it cause a lot of strain on your family life?

A.    No, I mean sometimes we'd -- she was very adamant about her lawn and I think she tried to claim property that wasn't hers. And we would ride our -- the kids and I would ride our 4-wheelers out back onto the back lot and she asked that we not do it or whatever, but it wasn't her property so -- it was ours. I mean, it was just –

Q.    As far as you knew, it was a legal dispute but didn't cause you any emotional grief?

A.    No. No.

Q.    As far as you knew, it wasn't causing any emotional grief for your family?

A.    Correct.

T.T.  185:10-25.  This does not necessarily lead to the conclusion that Tammy was fabricating her level of stress to Mary.  People react differently to the same circumstances and it is possible that Tammy felt stressed while Lee did not.  Still, it is noteworthy that Lee did not notice any particular strain or stress on family members as a result of the Allan Dispute.  A second bit of evidence is that both Tammy and Lee testified that their relationship with Ms. Allan remained "civil" throughout the course of the  dispute.  Again, this alone does not prove that Tammy was misrepresenting the state of her mind to Mary because it is quite possible to remain on civil terms with a legal adversary, even in a stressful dispute,  in effect hiding one's inner feelings when dealing with the person.  This is probably more the exception than the rule, however, and the Court believes that in most instances where a person was experiencing distress at a level such as Tammy was reporting to Mary, it would have a more marked effect on the person's relationship with the legal adversary.

Based solely on the direct and circumstantial evidence as to Tammy's true state of mind as discussed above, it would be a close call as to whether Mary has met her burden of proof to show that Tammy was engaged in a false pretense regarding the Allan Dispute. The Court is not limited to a consideration of that evidence only, however.

Because of the obvious proof difficulties involved in trying to establish a defendant's state of mind in *Section 523(a)(2)(A)* litigation, it is well-recognized that a court may consider the "totality of circumstances" when determining whether a "picture of deceptive conduct on the debtor's part" has been presented. *See, e.g., In re Barnette*, 281 B.R. 869, 874 (Bankr. W.D. Pa. 2006). This can even include subsequent conduct by the debtor, to the extent that it provides an indication of debtor's state of mind at the time of the actionable representations. *See, e.g.*, *In re Copeland*, 291 B.R. 740, 766 (Bankr. E.D. Tenn. 2003); *In re Giquinto*, 388 B.R. 152, 167 (Bankr. E.D. Pa. 2008).

When the Court expands its view to the totality of circumstances in this case it finds a number of things that point to the conclusion that Tammy was engaged in deceptive conduct in her dealings with Mary concerning the loan. First, despite asking Lee about the possibility of a loan from Mary, and being told "no" by him because of his belief that they were already "tapped out" and could not pay it back, Tammy nevertheless proceeded with the loan. Second, Tammy then kept the existence of the loan hidden from Lee for a couple of months, and even after finally telling him about it, she did not disclose to him that proceeds from the loan had been used in the purchase of the Kersey Property – he claims not to have learned that fact until he was deposed in the instant adversary proceeding in May, 2015. The Court finds that this deceptive conduct by Tammy

24

provides a clear glimpse into the state of her mind concerning at least the $58,000 loan. *See, e.g., United States v. Simonelli*, 237 F.3d 19, 30 (1st Cir. 2001) (fact that defendant took steps to hide his use of corporate funds could lead to an inference of intent to commit fraud); *In re Wyly*, 2016 WL 3098200, at *73 (Bankr. N.D. Tex. May 10, 2016) (quoting *Spies v. United States*, 317 U.S. 492, 499 (1943))(fraud may be inferred from "any conduct, the likely effect of which would be to mislead or to conceal.").

A third point is that rather than leave quickly from the St. Marys Property by buying another house that was move-in ready, Tammy agreed to purchase the Kersey Property knowing that it would need work and would not be ready for occupancy for an extended period of time. This was not what one would expect from someone who was supposedly experiencing a severe level of distress and who wanted to move away from the situation as soon as possible.

A fourth factor in a totality of circumstances consideration is that after the loan was made Mary asked Tammy to sign a homemade promissory note to memorialize it, and after successfully evading the matter for several months Tammy falsely told her that she had signed the note. TT 34-35:24-8. Fifth, the additional $1,600 loan that occurred following the initial loan not only smacks of manipulation by Tammy, but also coupled with the fact that she did not want to be seen in public taking the money from Mary is telling in that it shows consciousness that what she was doing was questionable.[8]

---

[8]     The Complaint seeks to have the $1,600 loan also found to be non-dischargeable. However, the Plaintiff did not make that argument at trial or in her post-trial brief, so she appears to have abandoned it. Even if the Plaintiff has not abandoned it, the Court would find that she clearly failed to meet her burden of showing why this separate loan transaction, occurring more than a year after the $58,000 loan, should be found non-dischargeable. In particular, there was no

In the Court's view, each of these instances is indicative of someone with something to hide, or a guilty conscience, or who was not acting consistently with the representation that had been made to Mary.  The Court therefore concludes that Tammy engaged in a pattern of false pretense in her interactions with Mary respecting the effect that the Allan Dispute was having on her – such falsity likely consisting of a conscious exaggeration of the level of stress she and the family were feeling. Based on the evidence presented, the Court finds by a preponderance of the evidence that Mary was induced to make the $58,000 loan by the false pretense created by Tammy.  Mary has thus proven the first element under *Section 523(a)(2)(A)* in that limited respect.

The second required element for Mary to prevail under *Section 523(a)(2)(A)* is proof that Tammy knew the representations or pretense were false at the time she was engaged in them. This element would be met because, barring some sort of mental condition that impaired her cognitive abilities – which has not been alleged here – a person falsely representing her state of mind to another would have to know such representation was false.

The third required element is proof that Tammy made the false representations or pretense with the intent and purpose of deceiving Mary.  This is the so-called "scienter" requirement. Because a debtor will rarely admit that a deception was done on purpose, intent to deceive can also be inferred from the totality of circumstances, including the debtor's reckless disregard for the truth.  *In re Ortiz*, 514 B.R. 762, 768 (Bankr. D.N.J. 2014) (quoting *In re Cohn*, 54

---

evidence presented as to any misrepresentation or false pretenses by Tammy in connection with the $1,600 loan. Although Plaintiff failed to prove non-dischargeability, the Court does view the circumstances surrounding the $1,600 loan evidencing a pattern of Tammy taking advantage of Mary.

26

F.3d 1106 (3d Cir. 1995)).  In the recent case of *In re Bocchino*, 794 F.3d 376 (3d Cir. 2015) the court explicitly held that the scienter requirement under *Section 523(a)(2)(A)* can be met not only by showing that the debtor had an intent to deceive, but also by a showing that the debtor acted with gross recklessness.

 The issue then is whether Mary has proven that Tammy intended to deceive her, or acted in a grossly reckless manner.

Tammy denies any intent to deceive.  Establishing that a debtor acted with intent is a "difficult burden." *Sosso*, 516 B.R. at 312.  In order for the Court to conclude that Tammy intended from the very beginning to deceive Mary into loaning her the money, it would have to believe that she was patient and devious enough to have engaged in a methodical deception that extended over the course of several years.  Moreover, it would have to believe that she did so without ever once even asking Mary for a loan, instead basing such plan on  the mere hope or expectation that Mary would be so moved by her plight as to one day spontaneously offer a loan.

Such a scenario is certainly not impossible, though it strikes the Court as highly implausible.  In the Court's view, a more likely explanation for Tammy's conduct, and borne out circumstantially by unrebutted, credible evidence offered by Mary as to her motivation in offering the loan, begins with a recognition that during the relevant time period Tammy was likely feeling some level of dissatisfaction with living at the St. Marys Property.  This would have included the ongoing Allan Dispute, as well as a desire to have more land so she could pursue her interest in raising vegetables and fruits.  That dissatisfaction, coupled with the human penchant to vent or unburden oneself of one's troubles to someone with a willing and sympathetic ear, would naturally have led Tammy to confide with Mary about her feelings.

While the Court accepts that such discussions may have started out innocently on Tammy's part, with no intent to deceive, a natural tendency to embellish obviously could come into play leading to an overstatement of her level of stress, or perhaps, Mary just misinterpreted what she was being told.  In any event,  at some point Mary said or did something in response to what Tammy was telling her  that indicated to Tammy that Mary was willing to help her out financially so the family could move from the St. Marys Property.  Tammy turned down this initial suggestion, but as the record supports, being an intelligent and perceptive person, she then realized that it was within her power to get Mary to offer her money any time she wished merely by saying something or behaving in such a manner that would play on Mary's concerns about Tammy and her family.  The truth of that conclusion was borne out in November, 2011, when a declaration by Tammy that she was "going nuts" led to Mary insisting on the loan.

In short, the Court finds that Tammy did not set out from the beginning with an intent to deceive Mary about the level of stress she was feeling over the Allan Dispute, but it became an intentional matter once she learned that Mary could in effect be manipulated into loaning money by exaggerating and highlighting such stress.  *See, e.g., In re Fosco*, 289 B.R. 78, 87 (Bankr. N.D. Ill. 2002) (an intent to deceive may logically be inferred from a false representation which the debtor knows or should know will induce another to advance money to the debtor).  The third required element has therefore been proven.[9]

---

[9]    Although the present case arises under the exception to discharge provisions set forth in *Section 523(a)* of the Bankruptcy Code, the factual circumstances are such that the  Court cannot help but be struck by the likeness to cases based on the common law doctrine of undue influence. Undue influence has been defined as a "subtle, intangible and illusive thing ... generally accomplished by a gradual, progressive inculcation of a receptive mind ... Consequently, its manifestation may not appear until long after the weakened intellect has been played upon." *Owens*

The fourth required element is proof that Mary justifiably relied upon the false pretense or representation in offering the loan. "Justifiable reliance" is a term of art describing an intermediate level of reliance, between "mere reliance" on the one hand and "reasonable reliance" on the other. *See, Field v. Mans*, 516 U.S. 59, 73–74 (1995). Justifiable reliance is distinguished from reasonable reliance in that the latter is measured with respect to the hypothetical reasonable person, thereby establishing a community standard of conduct applicable in all cases, whereas the former takes into account the qualities and characteristics of the particular plaintiff and the circumstances of the particular case. *Id.* at 71. The *Field* court also quoted with approval from a well-known text on tort law to the effect that

> "it is only where, under the circumstances the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own."

*Id*. at 71-72 (quoting W. Prosser, *Law of Torts* §108, p. 718 (4th ed. 1971)).

---

*v. Mazzei*, 847 A.2d 700, 706 (Pa. Super. 2004) (quoting *In re Estate of Clark*, 461 Pa. 52 (1975)). The prototypical undue influence scenario, of course, involves an elderly victim who is taken advantage of by being led to make an inter vivos gift or testamentary bequest to a person outside the usual ambit of the recipients of such bounty whom the victim has come to trust and rely upon. The parallels to the present case are obvious.

The Court does not wish to stretch the analogy too far. In most instances where a transaction is set aside on the basis of undue influence, it has been proven that the victim and the perpetrator were in a "confidential relationship" when the undue influence occurred. Under Pennsylvania law a confidential relationship exists under circumstances that "make it certain that the parties did not deal on equal terms; where on the one side there is an overmastering influence, or on the other, weakness, dependence or trust, justifiably reposed." *Leach v. Davis*, 2015 WL 7571967 *4 (Pa. Super. Ct. Feb. 5, 2015) (quoting *Hera v. McCormick*, 625 A.2d 682 (Pa. Super. Ct. 1993). Showing the existence of a confidential relationship was not an element of Plaintiff's case so the Court need not make that determination. Still, it can at least be noted there are obviously some indicia of a confidential relationship present given Mary's weakness (age and medical condition), dependence (inability to travel outside the home or transact business affairs without assistance) and trust (allowing complete access to her bank accounts).

29

The relevant circumstances of Mary's condition here would include that she was of advanced years, that she suffers from eyesight difficulties, that she is dependent upon others for assistance with such tasks as paying bills and going to places outside the home, and that she was in a relationship with Tammy that, while perhaps not quite rising to the level of a confidential or fiduciary one, was at the least trusting and close. Moreover, there was nothing in the nature of a "warning" prior to the creation of the loan that should have alerted Mary that she should make her own investigation before offering to make the loan. The Court thus finds that the justifiable reliance element has been met.[10]

The final required element is proof that Mary was damaged as a proximate result of the false pretense or representation. This element too has been met. In the absence of the false pretense by Tammy it can be confidently presumed that Mary would never have offered to make the loan. She did, however, make the loan and as a result she is now faced with a large unpaid balance and the existence of a mortgage on her property that must be paid off or else she risks losing the house. These are clearly damages that were proximately caused by Tammy's fraudulent conduct. Mary has thus met her burden of proof as to all of the elements required to have the remaining debt from the $58,000 loan declared to be non-dischargeable under *Section 523(a)(2)(A)*.

In her complaint Mary also raised *Sections 523(a)(4)* (fraud or defalcation while acting in a fiduciary capacity) and *523(a)(6)* (willful and malicious injury by the debtor) as additional grounds for finding the loan obligations non-dischargeable. She did not, however, argue

---

[10]     *See also* fn 9, above.

30

at trial for the application of those provisions or provide any evidence to support them, nor did she

address them at all in her post-trial brief.  For these reasons, the Court finds that Plaintiff has

abandoned any claim for nondischargeability based on those provisions.  *See, e.g., In re Ice Cream*

*Liquidation, Inc.*, 2005 WL 976935 (Bankr. D. Conn. Apr. 21, 2005) (by failing to brief or argue

issue party was deemed to have abandoned it).

Even if Mary had not abandoned those alternative claims, the Court would find

against her on them.  Very briefly, as to *Section 523(a)(4)*, Mary has failed to prove that Tammy was

acting in a fiduciary capacity.  *See, e.g., In re Bayer*, 521 B.R. 491 (Bankr. E.D. Pa. 2014)

(explaining that the concept of a "fiduciary" for purposes of *Section 523(a)(4)* is narrower than the

traditional common law definition and generally requires the existence of an express or technical

trust); *In re Librandi*, 183 B.R. 379 (Bankr. M.D. Pa. 1995) (rejecting argument that fiduciary

capacity could be found based only on alleged  "special relationship" between parties).

As to *Section 523(a)(6)*, Mary has failed to prove that Tammy acted maliciously with

an intent to harm Mary, or that such injury was substantially certain to occur, in connection with the

loan, elements that would be required under that provision.  *Kawaauhau v. Geiger*, 523 U.S. 57, 61-

62 (1998).  The fact that Tammy did make timely payments on the loan for approximately 1½ years

after it was made is sufficient to negate any suggestion that she entered into that loan with an intent

never to repay it and thereby injure Mary. *See, e.g., In re Gemme*, 459 B.R. 493, 499  (Bankr. D.

Mass. 2011) (debtor's two-year track record of loan repayments suggested that at the time of the

loan proposal and closing he had every intention of repaying it).

31

To sum up with respect to the claim against Tammy under *Section 523(a)(2)(A)*, the Court finds, that as to the $58,000 loan obligation, Mary has proven each of the required elements by a preponderance of the evidence.  As such, the debt which Tammy owes to Mary resulting from the $58,000 loan obligation will be excepted from discharge.  The Court was also asked to determine the amount of that debt but that item was disputed (see Complaint and Answer at ¶8) and no evidence as to the remaining amount owed was specifically provided at trial.  Furthermore, it is unclear how the subsequent $1,600 loan factors into the Plaintiff's contention that $49,000 should be established as the non-dischargeable amount.

In the Complaint it appears that Plaintiff alleges that both the $58,000 and $1,600 came from the same equity line of credit, and the purported $49,000 balance is thus a combination of both loans.  *See,* Complaint at ¶41.  In the post-trial brief, however, the Plaintiff seems to relate the $49,000 balance specifically to the $58,000 loan.  Post-trial Brief at ¶¶6–7.  Given the uncertainty as to the proper amount of non-dischargeable debt, the Court will schedule an argument to address that point with the Parties in more detail.  They remain free in the meantime, of course, to talk and try to arrive at an agreed-upon figure.  Therefore, as a result, the Court makes no finding of a specific amount at this time.  The Court further finds that Mary has waived her alternative claims under *Sections 523(a)(4)* and *(6)* by failing to argue them in her post-trial brief, and that even in the absence of such waiver she has failed to prove them.  Having decided Mary's claims as to Tammy, the Court turns next to Lee.

32

*Liability and Discharge of Lee*

It was undisputed that Lee had nothing to do with securing the loan from Mary.  The various conversations leading up to and culminating in the loan all involved only Tammy and Mary. Lee never asked Mary for a loan nor did he ever agree to be responsible for the loan either as a principal obligor or a guarantor.  In fact, he testified credibly that Tammy had broached  with him the possibility of a loan from Mary sometime prior to the purchase of the Kersey Property and he specifically told her "no way."   In the absence of any evidence that Lee was involved in any fraudulent conduct himself, or that he was a party to the loan agreement, Mary seeks to hold him liable, and to have that liability found to be nondischargeable, on the basis of his status as Tammy's husband.

As a general rule, the fraudulent practices of one spouse are not imputed to the other spouse for purposes of nondischargeability under *Section 523(a)(2)(A)*.  *See, In re Antonius*, 358 B.R. 172, 184 (Bankr. E.D. Pa. 2006) (citing *In re Carp*, 340 F. 3d 15 (1st Cir. 2003) and *In re Tsurkowa*, 258 B.R. 192 (9th Cir. BAP 2000)); *In re Davis*, 476 B.R. 191, 199 (Bankr. W.D. Pa. 2012).  The fraud of a culpable spouse can, however, be imputed to an "innocent" spouse in certain instances.  Under partnership or agency principles, where the spouses are engaged in a business venture or if one spouse knowingly aided and abetted in the fraud, the fraud of one can be imputed to the other.  *Antonius*, 358 B.R. at 185.  These "exceptions" to the protection provided to an innocent spouse do not apply in this case.  There was no evidence to show that Tammy and Lee were engaged in any kind of business or for-profit venture that could be characterized as a partnership, separate from and in addition to  their marital relationship,  or in which Tammy could be viewed as

33

having acted as an agent for Lee in her dealings with Mary.  There was also no evidence that Lee aided and abetted Tammy with respect to the conduct the Court found to be fraudulent. It would therefore appear that there is no reason why Lee should be found liable to Mary on the loan, or, even assuming he was somehow liable, why such liability would not be discharged in this bankruptcy.

Mary relies on a line of cases decided under Pennsylvania law recognizing an "entireties presumption" pursuant to which either spouse presumptively has the power to act for both in matters of entireties, without any specific authorization, provided the fruits or proceeds of such action inures to the benefit of both and the entireties estate is not terminated.  *See, J.R. Christ Const. Co. v. Olevsky*, 426 Pa. 343 (1967).

 In *Olevsky*, the defendants were a husband and wife who owned a farm as tenants by the entireties.  The husband contracted for the rental of some heavy equipment that was used for grading and excavation on the farm in connection with the construction of a riding ring for horses. The plaintiff sued on the unpaid bill, also naming the wife as a defendant.  The Pennsylvania Supreme Court upheld a finding by the lower court that the wife could be held liable along with the husband even though she had not been a party to the contract.  In so finding it commented that there is no general agency arising from the marital relationship, nor any presumption flowing therefrom that either spouse has authority to convey real estate held by the entireties without the other's joinder, but the court noted that the foregoing was not a complete statement of the law because:

> The presumption ... with respect to properties held by the entireties, is that during the term of a marriage, either spouse has the power to act for both without specific authority, so long as the benefits of such action inure to both. This presumption, as stated, does not require knowledge on the part of the other spouse in question, but only that

34

it may be rebutted if, in fact, the spouse so acting was not authorized
to act by the other spouse.

*Olevsky*, 426 Pa. at 349.

It can quickly be seen that for several reasons this principle of Pennsylvania law as recognized in *Olevsky* and other cases cited by Mary has no application in the present case that would require a deviation from the general rule noted above regarding non-imputation of fraudulent conduct.  First, Tammy's dealings with Mary concerning the loan did not involve any existing property that she held by the entireties with Lee.  Second, the Pennsylvania "law" is actually  only a presumption and can be rebutted.  In this case there was positive testimony, which the Court credits, that Lee had specifically told Tammy he was not interested in  obtaining a loan from Mary, so the Court finds she was not authorized to act on his behalf regarding the loan.  Third, and perhaps most importantly, the entireties presumption concerns only the question of the liability of the non-acting spouse under Pennsylvania law.  It does not address the separate question of whether such liability can be discharged in bankruptcy under *Section 523(a)(2)(A),* which is a matter of federal law.  *Grogan, supra,* 498 U.S. at  284 (1991) ("Since 1970 ... the issue of non-dischargeability has been a matter of federal law governed by the terms of the Bankruptcy Code");  *In re Tashlitsky*, 492 B.R. 640, 648 (Bankr. E.D.N.Y. 2013).   As indicated by *Antonius* and the other cases cited above, federal law does not generally impute the fraudulent acts of one spouse to the other innocent spouse for purposes of nondischargeability except in special circumstances not present here.[11]

---

[11]    Mary does cite one bankruptcy case wherein the court did to an extent rely on the Pennsylvania entireties presumption to deny an innocent spouse a discharge regarding an obligation to repay $15,000 which her husband had embezzled from his client without her knowledge and then used to acquire entireties property.  *See, In re Brady*, 234 B.R. 652 (Bankr. E.D. Pa. 1999).

For the above reasons, the Court finds that, regardless of the moral or ethical considerations that might flow from his conduct,  Lee is not legally  liable to Mary on the loan obligation, and that even if he were liable such liability can be discharged in this bankruptcy case because Mary has failed to prove that there is any basis to impute the fraudulent conduct of Tammy to him.

### *Denial of Exemption and Subordination of Claim*

Mary also seeks a ruling  that the Debtors' exemption in the Kersey Property be denied, and their equity interest in it be subordinated to her claim.  *See*, Complaint at Counts IV and V.  Mary argues that this relief is warranted because of the fraudulent conduct and bad faith of the Debtors.  She contends the Debtors will receive a windfall at her expense if this relief is denied.  In support she cites several cases in which bankruptcy courts have provided similar relief, although no statutory authority under the *Bankruptcy Code* for such relief is cited other than *11 U.S.C. §105(a)*, the provision which says that bankruptcy courts may issue such orders or judgments as are necessary or appropriate to carry out the provisions of the *Code*.

All of the cases relied upon by Mary predate the Supreme Court's opinion in *Law v. Siegel,__U.S.__,*  134 S. Ct. 1188 (2014). In that case, the court rejected the contention that

---

However, by that court's own admission it was following a minority view, and its holding on this particular point does not seem to have been followed subsequently in other cases.  *Brady* thus appears to be something of an outlier that this Court is not inclined to follow.  In addition, the *Brady* court justified the result by pointing out  that the debtors had not offered any evidence that tended to rebut the entireties presumption of agency, which clearly distinguishes it from the present case where there was such "rebuttal" testimony.

bankruptcy courts have a "general equitable power" to deny exemptions to debtors based on their bad faith conduct, holding that "federal law provides no authority for bankruptcy courts to deny an exemption on a ground not specified in the Code." *Id*. at 1196. Mary has cited nothing in the *Bankruptcy Code* that would provide for a denial of the exemption under the facts of this case, and under *Law* the Court must therefore deny the requested relief.

The request for a "subordination" of the Debtors' equity interest in the Kersey Property to Mary's claim must likewise be denied. The Court's power to engage in equitable subordination is clear. *See, 11 U.S.C. §510(c)*. However, the equitable subordination contemplated by that statute is intended to allow the Court to subordinate or adjust the claim payment priority as among creditors of the estate to avoid inequity. *See, e.g., In re Enron Corp*., 379 B.R. 425 (Bankr. S.D.N.Y. 2007) (purpose of equitable subordination is to undo wrongdoing by an individual creditor in the interest of other creditors). The Court has been pointed to no authority, nor has it found any on its own, that would allow equitable subordination to be used as a tool to adjust the relationship as between debtors and creditors.

Looked at somewhat differently, Mary is in effect asking the Court to impose a mortgage on the Kersey Property in her favor. An equitable mortgage or lien can be imposed by a bankruptcy court in certain circumstances. *In re Turetsky*, 402 B.R. 663 (Bankr. W.D. Pa. 2009). For example, when the parties intended to make property security for a debt but a defect renders the intended mortgage invalid, imposition of an equitable mortgage may be appropriate. *See. e.g., Herb v. Citimortgage, Inc*., 955 F. Supp. 2d 441 (M.D. Pa. 2013). In the present case, Mary never sought a security interest in connection with the loan, nor did Tammy ever offer one. The Court therefore finds no basis for imposition of an equitable mortgage on the Kersey Property.

### CONCLUSION

The Court finds that the balance of Tammy's debt to Mary on the $58,000 loan obligation is excepted from discharge  pursuant to *11 U.S.C. §523(a)(2)(A)*.  The amount of that balance is not being determined at this time and an argument on that will be scheduled.  The Court further finds that Lee is not liable to Mary on either loan, and that even if he was liable, such liability would not be excepted from discharge under *Section 523(a)(2)(A)*.  Finally, the Court will not deny the Debtors their exemption in the Kersey Property or subordinate their equity interest in it to Mary's  nondischarged claim against Tammy and all other relief requested in the Complaint is denied.

An appropriate order of judgment will be issued separately.

Dated: July 19, 2016

_____
Thomas P. Agresti, Judge
United States Bankruptcy Court

Case Administrator to serve:
    Mark A. Lindsay, Esq.
    Earl D. Lees, Esq.
    David Hopkins, Esq,
    Debtors